IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
———————————————————————————

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | |
| THE EXTRADITION OF | ) | 25-mj-5144 |
| | ) | |
| NEHAL DEEPAK MODI | ) | |

———————————————————————————

## MEMORANDUM OF EXTRADITION LAW AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its extradition treaty obligations to India, requests that the fugitive in this case, Nehal Modi ("Modi"), be detained until the conclusion of the extradition process. This memorandum summarizes the framework of extradition law in the United States and demonstrates that Modi should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, Modi cannot meet his burden to show that he poses no risk of flight or danger to the community, and that no special circumstances are present to warrant his release.

## BACKGROUND

India has requested Modi's extradition so that he can face prosecution for: (1) money laundering, in violation of the Prevention of Money Laundering Act ("PMLA"), 2002, Section 3 (PMLA Special Case No. ECIR/MBZO-I/03/2018); and (2) conspiracy to cause disappearance of evidence of an offense or to give false information to screen an offender, in violation of Sections 120-B and 201 of the Indian Penal Code ("IPC") (Criminal Case No. RCBSM 2018 (E) 001 of CBI, BSFB, Mumbai).[1] On July 27, 2018, Special Judge M.S. Azmi,

---

[1] Modi is charged with additional violations of Indian law, but these are not currently referred to the Court for consideration.

Court of Sessions for Greater Mumbai, issued a warrant for Modi's arrest for the aforementioned money laundering charge. Additionally, on June 29, 2020, Special Judge V.G. Barde, City Civil & Sessions Court for Greater Mumbai, issued a warrant for Modi's arrest for the aforementioned conspiracy charge.

The information the Government of India has provided reflects the following:

Between approximately 2011 and 2017, Modi's brother, Nirav Modi ("Nirav"), fraudulently obtained numerous Letters of Undertaking (LOUs) from Punjab National Bank's (PNB) Brady House branch in Mumbai. Gokulnath Shetty, then a Deputy Manager at PNB, participated in the scheme, granting LOU requests and providing the funds to Nirav's companies at very low interest rates and without requiring collateral. Further, he provided the LOUs without entering them into the bank's Core Banking System, which would have ensured they were backed by margin money or collateral.

The affidavit of Kapil Raj, the Deputy Director of the Directorate of Enforcement's Mumbai Zonal Office-I, details that under this scheme, 1,206 fraudulently obtained LOUs with a total value of approximately $373,963,000 issued from PNB to three entities that Nirav set up (M/s. Diamond R Us, M/s. Solar Export, and M/s. Stellar Diamond). Nirav subsequently dispersed most of those funds (approximately $276,544,604) to at least fifteen shell companies listed as jewelers in the United States, Hong Kong, and the United Arab Emirates. The shell companies, in turn, further dispersed funds.

Several individuals who served as dummy directors of Nirav's shell companies abroad told Indian authorities that they were dummy directors, and that the shell companies engaged in circular transactions. They explained that the shell companies imported and exported

goods between one another and listed their inventory at inflated values on invoices to justify obtaining larger credit lines from Indian banks. They further explained that jewelry that was shipped between the companies had the diamonds and pearls removed, and that gold and silver were sent between the companies only for melting and not for resale. The entire purpose of the import and export scheme was to generate false invoices and balance sheets to justify obtaining further lines of credit. Deputy Director Raj also describes that from 2015-2017, Nirav used funds fraudulently obtained from PNB to repay previous debts, rather than using the funds to conduct overseas business with suppliers.

According to Dinesh Bhardwaj, an Assistant General Manager at PNB: On January 26, 2018, the fugitive in this proceeding, Modi, attended a meeting at PNB. During this meeting, Nirav called Bhardwaj's mobile number via WhatsApp and told bank staff that he authorized Modi to speak regarding Nirav's bank accounts and that whatever Modi agreed to with the bank would work for Nirav. During this meeting, Modi requested that PNB issue new, additional credit to Nirav's three parent companies through new LOUs, and Modi stated that in the meantime, Nirav would try to make payments to PNB that had come due on January 25, 2018, under previous LOUs. Bank officials told Modi that Nirav must immediately repay the outstanding LOUs before seeking further credit. Modi stated that he would talk to Nirav and then come back to PNB. On January 29, 2018, the bank decided to freeze Nirav's accounts and filed a complaint with India's Central Bureau of Investigation.

Also according to Bhardwaj, on February 8, 2018, Modi arranged and attended a video conference with Nirav and bank representatives from a consortium of Mumbai banks including PNB. During this meeting, Nirav confirmed that he had applied for and received

the LOU funds from PNB on behalf of his three firms.  Also during this meeting, the bank

told Nirav that PNB had never approved or sanctioned the issuance of those LOU funds, and

bank officials accused Nirav (in Modi's presence) of having cheated the bank.  Nirav objected,

and PNB demanded that Nirav produce documents or orders from PNB that proved the LOU

funds had been properly approved by the bank.  PNB representatives also told Nirav that he

would only be allowed to continue using PNB LOU funds if he produced these documents to

the bank's satisfaction.

Several individuals who served as dummy directors of Nirav's shell companies in

Dubai and Hong Kong told Indian authorities that in March 2018, after Nirav and his

associates were under investigation in India, Modi took various actions to hide criminal

proceeds, destroy evidence, and otherwise thwart the investigation. According to these

directors, Modi traveled to the shell companies' locations in Dubai and Hong Kong, and took

possession of cash, diamonds, pearls, and/or gold from the companies' premises.  For

example, Bhavik Shah ("Shah"), director of M/s Brilliant Diamonds, and Ashish Bajranglal

Bagaria ("Bagaria"), director of M/s Eternal Diamonds Corp., stated that in March 2018,

Modi came to Hong Kong and instructed the dummy companies there to liquidate.  Further,

Shah and Bagaria each stated that Modi instructed the directors in Hong Kong to pack all

available stock, and that Modi took away 10-12 parcels of loose diamonds and some large

stones from the company's premises. Ashish Kumar Mohan Bhai Lad ("Lad"), director of

M/s Sunshine Gems Ltd., told Indian authorities that he gave approximately 3.5 million

Emirati dirhams AED (approximately $953,000) in cash to Sandeep Mistry ("Mistry"),

director of World Diamond Distribution, who gave the money to Modi.   Nilesh Mistry

("Nilesh"), a director of M/s Hamilton Precious Traders, stated that, at Modi's instruction, he withdrew 300,000-400,000 AED (approximately $81,690-$108,922) from company accounts, which Mistry then gave to Modi.

Modi also directed or arranged for the mobile phones of dummy directors in Hong Kong and Dubai to be destroyed, and he destroyed a server in Dubai that serviced the cell phones. For example, Bagaria stated that in March 2018, Modi came to Hong Kong and instructed the directors to destroy their old mobile devices. Netaji Mohite ("Mohite"), director of M/s Vista Jewelry FZE, stated that in March 2018, Modi met with dummy directors in Dubai, where they were instructed to deposit their mobile devices and received new phones. Divyesh Kumar Nareshkumar Gandhi ("Gandhi"), a director of M/s Aurogem Co., stated that Modi, who handled crisis management for Nirav's companies, destroyed the cell phones of the dummy directors in Dubai and Hong Kong, instructed the staff to destroy records and computers, and destroyed a secure server in Dubai that was used to send transaction instructions.

Additionally, Modi told dummy directors to travel to Egypt to avoid contact with Indian law enforcement. Individuals who traveled to Egypt at Modi's instruction, including Ashish and Mohite, stated that in Cairo, Modi's associates took their passports. Additionally, before the directors left Cairo, they were asked to sign papers falsely stating that the companies belonged to the directors and were unrelated to Nirav. For example, Rushabh Jethava ("Jethava"), director of M/s Empire Gems, and Shreehdar Mayekar ("Mayekar"), director of M/s Unique Diamond, stated that before they left Cairo, they were asked to sign papers stating that their respective companies belonged to them, and not to Nirav. Further,

according to Ashish, Modi offered him 2 million INR (approximately $23,000) to provide false testimony in Nirav's favor to European authorities.

The United States, in accordance with its obligations under its extradition treaty with India (the "Treaty")[2] and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in the instant matter, seeking a warrant for Modi's arrest.  United States Magistrate Judge Roemer for the Western District of New York issued an arrest warrant, and Modi was arrested on July 3, 2025.  Modi is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I.    LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.    The limited role of the Court in extradition proceedings

Extradition is a means by which a fugitive is returned to a foreign country, typically pursuant to a treaty, to face criminal charges or to serve a sentence.  In the United States, extradition is primarily an executive function, with a limited role for the judiciary under 18 U.S.C. § 3184.  Pursuant thereto, the judicial officer's inquiry is confined to whether (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the treaty covers the crimes for which extradition is sought; and (5) probable cause exists to believe that the fugitive committed the offenses.  *See id.*; *see also Skaftouros v. United States*, 667

---

[2] *See* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of India, U.S.-India, June 25, 1997, S. TREATY DOC. NO. 105-30 (1997) (the "Treaty").

F.3d 144, 154-55 (2d Cir. 2011). "If the judicial officer answers these questions in the affirmative, he or she 'shall certify' the extraditability of the fugitive to the Secretary of State." *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000) (quoting 18 U.S.C. § 3184).

After a fugitive is certified as extraditable, the Secretary of State (the "Secretary") decides whether to surrender the fugitive to the requesting country. *See* 18 U.S.C. §§ 3184, 3186; *see also, e.g.*, *Lo Duca v. United States*, 93 F.3d 1100, 1103-04 (2d Cir. 1996). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

## B.      The requirements for certification

### 1.      Authority of the Court over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also* Local Crim. R. 59(b) (authorizing magistrate judges to conduct extradition proceedings pursuant to 18 U.S.C. § 3184).

2.    <u>Jurisdiction over the fugitive</u>

The Court has jurisdiction over a fugitive, such as Modi, who is found within its jurisdictional boundaries.  *See* 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3.    <u>Treaty in full force and effect</u>

Section 3184 provides for extradition in specifically defined situations, including whenever an applicable treaty or convention for extradition is in force.  At the extradition hearing, the United States will provide a declaration from the Office of the Legal Adviser of the U.S. Department of State attesting that the Treaty is in full force and effect.

4.    <u>Crimes covered by the Treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Here, the Treaty provides for the return of fugitives charged with, or convicted of, an extraditable offense.  Treaty, art. 1.  Further, the Treaty provides that an offense is extraditable if it punishable under the laws in both countries by "deprivation of liberty, including imprisonment, for a period of more than one year or by a more severe penalty." *Id.*, art. 2(1).[3]

In assessing whether the Treaty covers the offenses for which India has requested extradition, the Court should examine the description of criminal conduct that India has

---

[3] An offense is extraditable "if it consists of an attempt or a conspiracy to commit, aiding or abetting, counselling or procuring the commission of or being an accessory before or after the fact." Treaty, art. 2(2).  Further, an offense is extraditable regardless of  (a) whether the laws in both countries "place the offense within the same category of offenses or describe the offense by the same terminology; or (b) whether "the offense is one for which United States federal law

provided and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states, had the offense occurred here.  The Court "must review the applicable treaty and construe its language liberally."  *Kiss v. Niagara Cty. Jail (Head)*, No. 16-CV-1011-FPG, 2018 WL 2766102, at *3 (W.D.N.Y. June 8, 2018) (citation omitted).  "The law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see also, e.g., In re Pena-Bencosme*, 341 F. App'x 681, 684 (2d Cir. 2009) (stating that dual criminality requirement satisfied if "the *conduct* of the accused . . . falls within the proscription of American criminal law") (emphasis in original, internal quotation marks and citations omitted).

### 5.    Probable cause that the fugitive has committed the offenses

To certify the matter to the Secretary, the Court must find probable cause to believe that Modi committed the offenses for which India seeks extradition.  *See, e.g.*, *Cheung*, 213 F.3d at 88.  It is well-established that "the function of the extraditing magistrate is not to decide guilt or innocence but merely to determine whether there is 'competent legal evidence which . . . would justify [the fugitive's] apprehension and commitment for trial if the crime had been committed'" here, similar to a preliminary hearing in a criminal case.  *Shapiro* v. *Ferrandina*, 478 F.2d 894, 900-91 (2d Cir. 1973) (quoting *Collins*, 259 U.S. at 315; *see also, e.g.*,

---

requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting jurisdiction or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.  *Id.*, art. 2(3)(a)-(b).

*Austin*, 5 F.3d at 603 ("the order of extraditability expresses no judgment on [the fugitive's] guilt or innocence."); *In re Extradition of Mujagic*, 990 F. Supp. 2d 207, 219–20 (N.D.N.Y. 2013) "[T]he requesting country need only produce enough evidence to justify holding the [fugitive] to answer the charges pending against him." (internal quotation marks and citations omitted).

### C.    An extradition hearing follows unique procedures

Extradition hearings are neither criminal nor civil proceedings.  *See, e.g.*, *Austin*, 5 F.3d at 603 ("We have repeatedly noted, for example, that an extradition hearing is not a criminal prosecution: the order of extraditability expresses no judgment on [the fugitive]'s guilt or innocence.").  "By design, 'the procedural framework of international extradition gives to the demanding country advantages most uncommon to ordinary civil and criminal litigation.'" *Skaftouros*, 667 F.3d at 155 (quoting *First Nat'l City Bank v. Aristeguieta*, 287 F.2d 219, 226 (2d Cir. 1960)).  A summary of those advantages appears below.

#### 1.    Extradition Hearings Rely on Written Submissions and Do Not Require Live Witnesses

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply in extradition proceedings.  *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see also, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16. Hearsay evidence is admissible at an extradition hearing.  *See, e.g.*, *Collins*, 259 U.S. at 317 (stating that "unsworn statements of absent witnesses may be acted upon by the committing

magistrate"); *Simmons v. Braun*, 627 F.2d 635, 636 (2d Cir. 1980); *In re Ryan*, 360 F. Supp. 270, 273 (E.D.N.Y.), *aff'd*, 478 F.2d 1397 (2d Cir. 1973) ("A determination of probable cause in an extradition proceeding may rest entirely upon hearsay.").  Accordingly, a certification of extraditability properly rests on the authenticated documentary evidence and information the requesting government provides.  *See, e.g.*, *Harshbarger v. Regan*, 599 F.3d 290, 294 (3d Cir. 2010) (finding that Canadian law enforcement officers' affidavits  were competent proof and "provided ample evidence of probable cause"); *Bovio v. United States*, 989 F.2d 255, 259-60 (7th Cir. 1993) (relying on statement of Swedish investigator); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1450-52 (9th Cir. 1987) (relying on affidavit of German prosecutor); *United States v. Amabile*, 14-M-1043, 2015 WL 4478466, at *9 (E.D.N.Y. July 16, 2015) ("[T]he certificate of extradition may be based on written statements provided by a foreign prosecutor, investigator or judge."); *Suyanoff v. Terrell*, No. 12-cv-05115, 2014 WL 6783678, at *8 (E.D.N.Y. Dec. 2, 2014) ("[W]ritten summaries of evidence, including witness testimony, are both permitted and frequently utilized in establishing probable cause within the extradition context") (citations omitted); *In re Extradition of Chan Hon-Ming*, 06-M-296, 2006 WL 3518239, at *7 (E.D.N.Y. Dec. 6, 2006) (relying on detective's affirmation setting forth the "major facts and evidence uncovered by the Hong Kong Police"). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. *See, e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Shapiro*, 478 F.2d at 902.

### 2.    Limitations on fugitives' defenses in extradition proceedings

Because an extradition hearing is not a criminal trial, a fugitive's defenses in extradition proceedings are heavily circumscribed.  For example, a fugitive has: (i) no Sixth

Amendment right to a speedy extradition, *see, e.g.*, *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994); (ii) no Fifth Amendment protection against successive extradition proceedings, *see, e.g.*, *In re Extradition of McMullen*, 989 F.2d 603, 612-13 (2d Cir. 1993); (iii) no ability to invoke the exclusionary rule, *see, e.g.*, *Simmons*, 627 F.2d at 636-37; (iv) no right to confront accusers, *see, e.g.*, *Bingham,* 241 U.S. at 517; (v) no right to invoke defenses that "savor of technicality," *see id.*; (vi) no right to introduce affirmative defenses, *see, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 461 (1913); and (vii)  no right to discovery, *see, e.g.*, *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984).

Relatedly, a fugitive's right to present evidence is severely constrained.  "In the exercise of the extraditing judge's discretion, a fugitive may be permitted to offer explanatory testimony, but may not offer proof which contradicts that of the demanding country."  *Id.* Accordingly, "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity may properly be excluded from the Magistrate's hearing." *Shapiro*, 478 F.2d at 901.  "[S]tatements [that] would in no way explain . . . or . . . obliterate the government's evidence, but would only pose a conflict of credibility . . . should properly await trial in [the country seeking extradition]."  *Id.* at 905 (internal quotation marks omitted).

### 3.    Rule of non-inquiry

All matters a fugitive may raise as defenses to extradition, other than those related to the requirements for certification, are for the Secretary to consider, and not the court.  *See* 18 U.S.C. §§ 3184, 3186.  This comports with the long-held understanding that surrendering a fugitive to a foreign government is "purely a national act . . . performed through the

12

Secretary[]." *See In re Kaine*, 55 U.S. 103, 110 (1852); *see also Ahmad v. Wigen*, 910 F.2d 1063, 1066-67 (2d Cir. 1990).

## II.    MODI SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*.  The federal statutes governing extradition, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail.  Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because an extradition proceeding is not a criminal prosecution.[4]  *See, e.g., Austin*, 5 F.3d at 603; *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 128 (E.D.N.Y. 2001).  Rather, bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.    Applicable law

1.    <u>A strong presumption against bail governs in international extradition proceedings</u>

Unlike in domestic criminal cases, "there is a presumption against bail in extradition cases." *Id.*; *see also, e.g., In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017).  The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the fugitive:

---

[4] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, and 3156(a)(2).  Here, Modi is not accused of an "offense" within the meaning of 18 U.S.C. § 3156, but rather of offenses that violate Indian law.

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. 40, 62 (1903).

Where, as here, a requesting country meets the Treaty's conditions, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In Re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. *See e.g., Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("No amount of money could answer the damage that would be sustained by the United States were the [fugitive] to be released on bond, flee the jurisdiction, and be unavailable for surrender, if so determined.") (quoting *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963)). Such reciprocity would be defeated if a fugitive flees after being released on bond.

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the country that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave India without either remedy or compensation. Given the United States' overriding interest, and the presumption against bail, "release on bail in extradition cases should be an unusual and

14

extraordinary thing." *Borodin*, 136 F. Supp. 2d at 128 (internal quotation marks and citations omitted).

> 2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

Given the strong presumption against bail, a fugitive may not be released on bail unless he demonstrates that (1) he is not a flight risk, (2) he is not a danger to the community, *and* (3) "special circumstances" warrant release. *See, e.g.*, *Leitner*, 784 F.2d at 160; *Martinelli*, 263 F. Supp. 3d at 1292.[5]  "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that fugitive facing serious charges in foreign country had the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr.

---

[5] Several courts have required fugitives to meet this burden with clear and convincing evidence, reasoning that the presumption against bail in extradition cases justifies a heightened standard of proof. *See, e.g., In re Extradition of Patel*, No. 08-mj-430, 2008 WL 941628, at *1 (D. Or. Apr. 4, 2008); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996).  Others have applied a preponderance standard. *See, e.g., Extradition of Santos*, 473 F. Supp. 2d 1030, 1035 n.4 (C.D. Cal. 2006).  Still others have found it unnecessary to resolve the issue because of the difficulty of satisfying either standard. *See, e.g., In re Extradition of Perez-Cueva*, No. 16-0233, 2016 WL 884877, at *2 (C.D. Cal. Mar. 7, 2016).

4, 2008) (considering that fugitive, a physician, had "more than sufficient assets available with which to flee").

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also, e.g.*, *Borodin*, 136 F. Supp. 2d at 130 ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases); *United States v. Tang Yee–Chun*, 657 F. Supp. 1270, 1272 (S.D.N.Y. 1987). Conversely, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances.

Special circumstances must be extraordinary and not factors applicable to all fugitives facing extradition. *See, e.g.*, *Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992). Courts have considered and rejected a lengthy list of claimed special circumstances, including:

- COVID-19. *See, e.g.*, *In re Extradition of Rollo*, No. 20-80746-MC-UNA/BER, at 3-4, 7 (S.D. Fla. May 28, 2020) at 3-4 (COVID-19 not "special circumstance" when no evidence that jail "is unable to provide adequate medical treatment should [fugitive] contract COVID-19"); *Risner v. Fowler*, 3:19- cv-03078, 2020 WL 2110579, at *7 (N.D. Tex. May 1, 2020); *Valentino v. United States Marshal*, 4:20-cv-304, 2020 WL 1950765, at *2 (S.D. Tex. Apr. 15, 2020);

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *Tang Yee-Chun*, 657 F. Supp. at 1271-72;

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Beresford-Redman*, 753 F. Supp. 1078, 1089-90 (C.D. Cal. 2010); *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999); *In re Extradition of Rovelli*, 977 F. Supp. 566, 568 (D. Conn. 1997);

16

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61;

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Garcia*, 615 F. Supp. 2d at 173-74; *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 290-91 (S.D.N.Y. 1992);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *In re Extradition of Knotek*, No. 13-9204, 2016 WL 4726537, at *3, 7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Borodin*, 136 F. Supp. 2d at 127, 131 (State Secretary of the Union of Russia and Belarus); *In re Extradition of Pelletier*, No. 09-22416, 2009 WL 3837660, at *3-4 (S.D. Fla. Nov. 16, 2009) (businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Antonowicz*, 244 F. Supp. 3d at 1070; *In re Klein*, 46 F.2d 85, 85 (S.D.N.Y. 1930); and

- Availability of bail for the same offense in the requesting country, *see, e.g.*, *Garcia*, 615 F. Supp. 2d at 172.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the Court's discretion, mindful of the strong presumption against bail and the reasons therefore.

B.    **Analysis**

The Court should deny bail because Modi poses a flight risk and because there do not appear to be any special circumstances that can overcome the strong presumption against bail.

Modi poses a significant flight risk. *First*, he has a history of evading justice. The materials from the Government of India reflect that Modi has known about the Indian investigation since 2018, and that he attempted to conceal and destroy evidence, and to provide false information. *See also, e.g., United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution." (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976))). Additionally, given the nature of his conviction in New York State – for grand larceny in connection with making false representations regarding a purported deal with Costco to obtain more than $2.6 million worth of diamonds from an Israeli diamond magnate – any representations he may make to this Court would not be credible.

Second, he is a Belgian national and is involved in pending removal proceedings to Belgium. His Belgian nationality entitles him to a passport that gives him access to the European Union. Moreover, it is the understanding of the United States that Belgium does not extradite its nationals outside the European Union. Thus, if Modi is not detained in this case, he has every incentive to accelerate his removal proceedings to Belgium (or to even consent to his removal), where he would face much lower odds of facing the charges against

him in India. The Court, therefore, has reason to surmise that Modi will continue trying to evade prosecution. As noted above, the upcoming extradition proceedings are limited in scope and afford Modi few rights, and the United States' burden to establish extraditability is relatively light. *See, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 483 (S.D. Tex. 2010) (finding that fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there are significant risks that he will be formally extradited"); *In re Extradition of Adame*, Misc. H-13-287, 2013 U.S. Dist. LEXIS 41682, at *7-8 (S.D. Tex. Mar. 25, 2013) (same). Further, the Indian charge against Modi for money laundering carries a potential penalty of twenty years imprisonment, and the Indian charge against him for conspiracy to cause disappearance of evidence of an offense or to give false information to screen an offender carries a potential penalty of seven years imprisonment. *See, e.g.*, *In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he [fugitive] is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Accordingly, no combination of bail conditions or promises can ensure Modi's appearance before this Court and the United States' ability to fulfill its treaty obligations to India. The flight risk Modi poses is, alone, fatal to any bail application.

Even if the Court were satisfied that Modi poses neither flight risk nor danger to the community, the United States is unaware of any "special circumstances" that would justify bail in this case.[6]

---

[6] Should, however, the Court be inclined to grant bail, the United States respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, to protect the United States' ability to meet its treaty

## **CONCLUSION**

For the foregoing reasons, the United States requests that Modi be detained until the conclusion of the extradition process.


DATED:  Buffalo, New York, July 11, 2025.


<p style="margin-left:40%">MICHAEL DIGIACOMO<br>
United States Attorney</p>

BY:    s/Fauzia K. Mattingly
FAUZIA K. MATTINGLY
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5875
Fauzia.Mattingly@usdoj.gov

s/ Charles M. Kruly
CHARLES M. KRULY
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5838
Charles.Kruly@usdoj.gov

---

obligations to the Government of India, the United States requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.